Next case is Dome Patent v. Lee. Good morning, Mr. Chairman. You're reserving four minutes before we vote. Yes, sir. All right. You may proceed. May it please the Court. This appeal concerns a challenge to the validity of Claim 1 of U.S. Patent 4-306-042 to NEEF. The threshold issue in this appeal is whether Section 282A of the Patent Act constrains the decision-making authority of patent trial and appeal boards in the same way that it constrains the authority of federal courts. That constraint is, in order for an issued claim in a patent, for a property right in a patent to be taken away without compensation, the law requires that the factual predicates of an invalidity theory be proved to a high degree of probability. Stanley, do you think that which standard of proof, whether it's clear and convincing evidence or the preponderance, those are the dueling standards here, correct? Yes, Your Honor. Do you think it makes a difference in this case? I most certainly think it makes a huge difference in this case, not just the confidence. So, no, no, I'm sorry. Time is limited. That's why I jumped in. So are you saying that if we agree with the, and I would ask your opponent the same question, only the flip side, that if we agree with the district court that preponderance of the evidence is the correct standard, you lose? I would not concede that. If Your Honor agrees, because there's not just… I said it makes a difference. It does make a difference. But it makes my case very easy. Because it's a very, I mean, I think, quite frankly, I think on the merits of the case, both sides here are well within the pale of reasonableness in their arguments. It's a close case. I think, you know, so it seems to me to be maybe one of those situations where the standard of proof does make a difference because you've got these competing points, the balancing of the wettability, the oxygen factor. Absolutely. So maybe it is a case where what standard obtains makes a difference. It absolutely does, not just on the degree of certainty that must be held by the back finder before it is authorized to take a property right away, but also in who bears what burden of proof. Because the district judge in this case of the government's instigation, even though this was a civil action in district court, treated this case as if we were in the patent office and Dohm was a mere applicant seeking to be granted a patent in the first time. The district court over and over again said, well, the government has made a prima facie case of obviousness, and therefore the burden shifts to Dohm to prove non-obviousness. And that made a huge practical difference in terms of who had to come forward with what. We have in this case an unbelievable situation in which the history of the case is pretty much set up in the first page of our reply brief. We have a situation in which, starting in the mid-1970s, artisans trying to solve the same problem that Mr. Neese solved came up with very different solutions. We have concrete, real-world evidence of what was and was not obvious at the time. Well, does it really come down to whether one of skilled in the art would have been motivated to combine the teachings of Gaylord and Tanaka? Well, here's what's significant and what distinguishes this case from other cases. The theory that the government presented to the trial court... But is that the issue? That's the issue, isn't it? The issue in the case is whether or not the entire process of Neese Claim 1 as a whole was rendered obvious by the prior art that the government relied on in this case. So what we have here is a process, a six-step process, in which Mr. Neese says what you do is you create a Triss monomer. And Triss monomer was one of the monomers used in the early patents, the Gaylord 1, Gaylord 2, and Ellis, the maker of the Boston II lens. They also worked with Triss, but they didn't come up with a Neese solution. Then after Ellis, you had Novicki and you had Tanaka, who proposed completely different systems for contact lens manufacture. Don't use Triss. Use other monomers. And Tanaka specifically gives various reasons why it's a bad idea to use Triss. So you have what a fact finder could reasonably have found was a contemporaneous failure. Tanaka, a paper patent, who says don't use Triss because if you use Triss, you have to copolymerize it with a hydrophilic co-monomer, and that's difficult. So what I've done is I've come up with a new novel monomer of my own. Was it a total, Mr. Daniel, was it a total teaching away? Because couldn't you use the Triss, and you know the terms there, so long as you had enough infusion of hydrophilic elements in the whole mix? I would say two things in response to that. First of all, the theory that you just articulated was a different one than the board adopted. That was the government's mid-trial change of strategy after they realized that their own experts' theory was insupportable, number one. Number two, when you talk about teaching away, you've already shifted the burden to don't. We would argue that the question is not whether Tanaka teaches away. The question is whether or not a person skilled in the art reading Tanaka as a whole would find in there a reason to do the opposite of what Tanaka says to be done. Tanaka says it's hard to use Triss because in order to suppress the foreign body sensation of a hydrophilic monomer like Triss, you've got to put so much of the other kind of co-monomer in there that it makes the oxygen permeability go way down. So the question of the patent gives a lot of leeway in the final paragraph there, doesn't it, in terms of the various components. The ranges are pretty broad. Well, in the NEEF patent, in the end. You're talking about the NEEF patent now? Yes. Yes. Well, the breadth of the NEEF patent gets into what the district court calls its commensurateness argument. It's not that Tanaka suggested a reason to make a contact lens manufacturing process like NEEF at all. What the government said was that Tanaka shows this huge range of cross-linking agents. Conventional ones, a novel one of his own design, and a 40-year-old one that had been disclosed in the 1950s. And he says, with my monomer, you can use any member of this huge, huge genus of cross-linking agents. So the government is saying, well, since Tanaka disclosed this huge range of cross-linking agents, it therefore was obvious to pick out one and then use that to go in a different direction and modify the old Gaylord-Triss-Palmer polymer. Where are we left when we look at the state-of-the-art? It seemed to be that everyone knew what we were looking for, this balance between wettability and oxygen permeability. And doesn't it appear that people could see there was a certain range of things that you could play around with, for want of a better term, to get what you were looking for? Well, the best I can do about that is... In terms of that was one skill in the art, maybe. Is that wrong? Yes, because the best I can do is to point, Your Honor, to pages 1982 and 1983 of the Joint Appendix, in which we had, in this case, what the government's position was in 2007, 2008, 2009, 2010, 2011, 2012, and the beginning of the trial. At the bottom of this page, the government's position, what the board said, because they were misunderstanding the prior art. This invention was so non-obvious that the government misunderstood the reference. This is 1982? Yes, where at the very bottom of the page he says, you said, to offset the hydrophobicity of the standard Triss monomer, as in Gaylord and Tanaka... Counsel, where are you reading from? Page 1982, line 24, and carrying over to the next page. Okay. You said, to offset the hydrophobicity of the standard Triss monomer, as in Gaylord and Tanaka, the cross-linking monomer would necessarily be hydrophilic, whether bearing siloxane units or not. And that statement was the government's position before trial. That was the position that the government took at the board level because they were misunderstanding Tanaka. The cross-linking agent that Mr. Neaf used, what's claimed in Claim 1, is not hydrophilic. It is hydrophobic. That's why it was so non-obvious and counterintuitive to do. So this was the position the government took. And then when the erroneous nature of their theory was exposed for the first time at trial, represented by Able Justice Department counsel, they called an audible and completely shifted gears to what Your Honor was alluding to. It says, well, it doesn't have to be hydrophilic. What our experts said here is wrong. Our Rule 26A disclosures were all wrong. And we're going to say, well, you could use a hydrophobic cross-linking agent. But does it really matter what the government's position was before or after? We're reviewing the district court's decision. It doesn't seem to me you've raised any kind of chinnery argument or that the district court has improperly relied on a legal argument. We're reviewing the district court's decision that this is obvious. And one of the things it found, and I think you argued this below, and he found against you, is that Tanaka didn't teach away or didn't teach away sufficiently to prevent an obviousness finding. And I'm suggesting that that's improperly changing the question. The question is not whether Tanaka teaches away. The question is whether Tanaka provides a reason in the first instance to do what Mr. Neef did. Why don't you address whether Tanaka does teach away? Well, we would say Tanaka, of course, teaches away because Tanaka, in his patent, says using TRIS is a bad idea for the reasons that I mentioned, and all in Column 3. It says TRIS is hydrophobic, and in order to use that material, you have to copolymerize it with a hydrophilic co-monomer, and that's hard to do, number one. But you didn't have to go to Tanaka to get the notion of using TRIS for a contact lens. No, no. That's okay, Lord and Ellis. Of course. But what Neef contributed, and what we have is another incredible contemporaneous demonstration of non-obviousness, is that the one artisan that was working with TRIS at that time, Ellis, they were working with TRIS. Number one, they not only did not deploy Neef's system, but they regarded TRIS dimer, one of these cross-linking agents, as an unwanted contaminant. Can you tell me precisely what you think is wrong with the district court? Are you saying there's a legal error there, or that he made factual errors in finding that there was motivation to combine these two, and that Tanaka didn't go away? Because it is not clear to me at all what you're arguing. What I'm arguing is that the district court did not impose upon the government the burden to show by clear and convincing evidence. Okay, let's put that aside. Assume I disagree with you about that. And the district court did not place upon the government the burden to deal with the commercial success evidence and the other contemporaneous failure evidence properly. So with respect to this specific point, for instance, we have the Boston Two Lens. We have contemporaneous documents in which the maker says TRIS dimer is an unwanted contaminant. Then three years after the NIEF patent issues, they change their process to adopt an equivalent of the Claim 1 process by deliberately and purposely putting that hydrophobic cross-linking agent in it. So you have there a contemporaneous proof that a company didn't see the solution, the patent issues, they then adopt the solution, which the district court found as a fact was used in the manufacture of one of the most commercially successful contact lens products of all time. But the district court discounted that because it was putting the burden on Dohm to prove the negative, that there weren't other reasons why Boston Four was so successful other than the shift to the Claim 1. Okay, Mr. Dabney, I think we got that so far. You're into rebuttal time. Okay. Do you want to reserve your time? Yes, I'll reserve my time. Thank you, Ron. Mr. White and Filler. Thank you, Judge Rayna, and may it please the court. I'd like to start, if I may, by answering Judge Hughes' last question, what is this case about? This case is about whether clear error underlies the district court's fact findings underlying its obviousness conclusion. There is no clear error. Dohm does not even really attempt to demonstrate clear error in the district court fact findings. And that's what this case is about. Do I want to just ask you the same question I asked Mr. Dabney when he got up. Does the standard of proof here control the outcome, clear and convincing evidence? I'm sorry, you know, the 282 standard or the preponderance of the evidence standard? Well, to directly answer your first question, which is does it matter, our view is that it does not. But actually, both you and the other side kind of make that argument. Each of you argues that, well, it doesn't matter, but you each do so in kind of a perfunctory fashion. I mean, it really does seem to be a pretty close case where the standard of review could make a difference. Not the standard of review, but the standard that applied at the trial. Well, with respect, Your Honor, I think that you've hit on exactly what is the problem with Dohm's argument in this case. Kappos v. Hyatt involved a standard of review, not a burden of proof. It said what happens when a judicial review, action seeking judicial review under Section 145 is brought in the district court. And it said the standard of review in such a proceeding, review of the board decision, is de novo if new evidence is submitted. It didn't say anything about a burden of proof. Now, what does Microsoft v. I4I say? It speaks only about burdens of proof, not standards of review. Why? Because the district court in an infringement action is not reviewing the agency's decision. It is taking in evidence. No, I understand. Mr. Dabney says, though, the 282 clear and convincing evidence should apply. Right. As opposed to what applied here, what the district court, what you're urging is a preponderance of the evidence. Right. That's what he says. But Microsoft does not stand for that. No, no, but I'm saying, and you don't think it makes a difference which standard is used. No, under In re etter, this court en banc held that, at least in the fact of that case, the evidence could be so strong that under either standard of review, the agency would win. But is that the case here? Could this be a case where under one standard you win, under another you lose? This could be such a case, but our position is that it is not such a case. We think that there's vast evidence supporting the district court's findings. But assuming we disagree with the standard that the district court applied, think that was clear and convincing evidence, it seems like it's close enough that we would have to send it back to the district court to look at the evidence under that standard. I understand your position that that's not the right standard, but it seems to me that this is not one of those cases where it's so clearly on one side that we could say the standard doesn't matter. I think the district court would have to reassess, wouldn't it? I think that it would be awkward for this court, assuming that Your Honor and Judge Stahl also seem to be saying that it's a pretty close case. If it were a close case, obviously, Etter would not apply it. Etter was saying this is not a close case, so we don't need to reach it. The appropriate thing would be to remand it to the district court. So I'm not too sure it's a close case because I'd look at Tanaka, and it seems that Tanaka is saying that if you use TRIST material to contact Lynn's material, that it's fatal to it. Is that correct? Well, what Tanaka says is that a lens consisting essentially of TRIST, and what that means is it's a term of art in patent law, meaning almost everything is TRIST. And Gaylord says don't go above 70 parts by weight of TRIST. So Gaylord recognizes that there is a maximum limit of TRIST that you would want in a contact lens, and that's about 70%. It doesn't say go all the way to something that is almost entirely TRIST. And what Tanaka is doing, Tanaka is trying to make a continuous wear lens, as the district court found, a lens that could be worn overnight, meaning while you're sleeping, the oxygen that gets to your eye is much lower. It's about one-third of the oxygen content in the air underneath your eyelid as it is just in the air itself. And so you would need vastly superior oxygen permeability for it to be worn overnight, and that's what Tanaka was aiming for. And Tanaka was saying that if I were trying to use TRIST to get to a continuous wear lens that I could wear overnight, I would have to use so much of it that I would exceed this Gaylord 70% number, and I would end up making a lens that had problems. Gaylord says as long as you do not go above 70%, you don't have problems with opacity. It says that the lenses that Gaylord made were translucent. Gaylord says that its lenses were made wettable. Gaylord says that even lenses that were not wettable initially could be made wettable by various treatments, including corona discharge and the addition of surface wetting agents. So Gaylord makes very clear that there is an upper limit, and Tanaka recognizes that there is an upper limit, and Tanaka, in order to get the result that Tanaka wanted, would have to go beyond that upper limit, but Tanaka in no way discourages people who are seeking a prolonged daily wear lens where the transmissibility and permeability of the lens could be much lower because you're taking it out at night while you go to sleep. Tanaka does not teach away from using that amount of TRIST. He says Tanaka teaches away only in the prolonged wear, namely overnight wear. Well, there's daily wear, which was what the Boston 2 lens was. It was a transmissibility of about 12. You couldn't actually wear it for a full day. You could maybe wear it for your working day, but you'd come home, take your lenses out, and wear your glasses for dinner and in the evening because you couldn't wear it for the entire day. Prolonged daily wear is a transmissibility or a permeability of around 18 to 20, so almost twice as much, and that is something that you can wear in your eye all day, but you have to take it out for sleeping. Tanaka was looking for continuous wear, which is something that you could wear— I'm sorry. I knew it was overnight wear, but I used the wrong term, continuous. So continuous as opposed to daily prolonged wear. Correct. That's correct, Your Honor, and that's what the district court found. And Tanaka says that his cross-linking agents, he calls out two particular classes of cross-linking agents as preferably employed in his invention. He calls them Formula 5 and Formula 6. Mr. Dabney says today that the claim in NEEF picks out one of those, just one of these many, many thousands or hundreds at least of chemicals. That's not the case. The NEEF patent claims Formula 6, so it claims one of those two, and Tanaka says both are preferably employed. Tanaka shows no indication that he prefers one over the other, and he would be afraid of using a hydrophobic cross-linker in his lens. He says it's preferably employed. Now he goes on and says that the one that's hydrophilic may have beneficial properties for wettability, but he says both the hydrophilic cross-linker and the hydrophobic cross-linker are preferably employed. He shows no distinction. And the claim range can be as low as 0.01% of the chemicals present in the polymer fall within the claim scope of this claim. So we have Gaylord teaching that you can be up to 70% of a hydrophilic monomer and still have no problems. And the theory that Dohm had in this case was that adding 0.01% to something as low as 5% to get 5.01%, a polymer chemist would never do that. They would be terrified of making that amount. That flies in the face of Gaylord. Gaylord indicates absolutely to the contrary. Gaylord indicates that you can go drive up to 70% hydrophilic monomers and not even worry about whether the lens itself at the end of the day will be wettable. Mr. Dabney today says that we came up with this theory in the middle of trial. That's not the case. In our expert report, our expert repeatedly pointed to, three times in the expert report, pointed to the references in Gaylord indicating that Gaylord can be made hydrophilic through uses of the surface conditioners such as the corona discharge or the surface wetting agents. He says that three times it was consistently, throughout the case, the government's position. And I also believe that Judge Hughes is correct. They did not object at trial. There's no reason why the district court's decision relying on the evidence in this case. So in your view, what is it that Tanaka says about the use of TRIS on contact lens material? Tanaka says that to get where Tanaka wants to go, which is a lens that you can wear overnight, he can't get there with TRIS. Let's start with his language that the use of TRIS on contact lens material is fatal to it. It turns it opaque. He says that the use of a lens consisting essentially of TRIS, which in patent law means almost 100% TRIS. There can be a couple other things in there, maybe 5%, 3%, 5%. But consisting essentially of means almost all TRIS, and that is not at all inconsistent with Gaylord's teaching that you can have up to 70% TRIS. What Tanaka is saying is that for him to get the transmissibility that he needs for overnight wear, he would need to go blast beyond that 70% number that Gaylord teaches, and then that's where you run into problems with the contact lenses. And I guess the final point I would make is on the secondary considerations evidence. I think that the district court properly discounted Dr. Malama's testimony. It's much like this court's Tanaka decision from this Wednesday in footnote 6. It says the evidence from one doctor about what that one doctor did is not probative of what the body of doctors would do. That's what Dr. Malama's testimony was. It was how he prescribed lenses, how he prescribed the Boston IV in his practice. And even were Dr. Malama's evidence to be given weight, the district court properly found that Dr. Malama undercut his own testimony by testifying as to the many benefits of the Boston IV lens beyond its increased oxygen permeability, and therefore correctly discounted the secondary considerations evidence and upheld the agency's decision. If there are no further questions, I'll yield the remainder of my time. If there are no further questions, thank you. Dr. Adrena, in response to your question, what Tanaka says about the use of TRIS is summarized in column 3, and he doesn't say use it except when you don't want to do a continuous wear lens. That was the theory that the government put forward for the first time. Does it make a distinction whether the lens is for prolonged use or daily use? The reference on itself does not. The reference says, if you take the government's best view of it, it says for a lens that you want to wear for a long period of time, you should not use something other than what I'm proposing here. But it doesn't say anything about, well, you can use TRIS for something else. He's proposing a completely different system of contact lens material. So this is a contemporaneous failure, not a reference that says, well, what you should do, there's a reason here, and you'll have a reasonable expectation of success in making a contact lens if you use TRIS monomer and use a cross-linking agent that NEEF used. It's just not there. I did not hear any response at all to the point about 1982 and 1983 of the record. The board decision in this case completely misread the Tanaka reference. The board decision misunderstood that the cross-linking agents described on pages in the record, it's column 8, 2146. If you read the board's decision in this case, they wrongly assumed they were all hydrophilic compounds. That's what their experts said, and they cited that as a reason why you would do it, because hydrophilicity would overcome one of the well-recognized problems of using TRIS. It was only when that error was pointed out to them, and they didn't distinguish between alkenol esters and alkyl esters, that they started talking about corona discharge and all these other hypothetical ways of trying to arrive at a rationale for coming up with NEEF. This is why the burden of proof is so important in this case. Microsoft was a watershed event in patent law. Microsoft said 282A codified a standard of proof, which is part of the patent grant, and reduced risk of erroneous adjudication is one of the rights that a patent owner has, and his rights can't be taken away without the same degree of confidence in the truth that is necessary in order to take someone's citizenship away, in order to take someone's custody rights away, in order to commit someone to a mental institution. Would you like to conclude? Yes. In this case, you don't need to resort to hyperbole. Just a short conclusion. Yes. Patent trial appeal boards are courts. The statute makes no exception for cases in which the tribunal is a patent trial appeal board or the litigant attacking the patent is the director of the patent and trademark office. It's a textualist decision, and the district court did not apply the right standard. Thank you.